UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JANELLE H.,

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 6:20-cv-06627-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on June 23, 2020, denied Plaintiff's applications for disability insurance benefits and supplemental security income.  Plaintiff has now moved for judgment on the pleadings (Doc. 13), and the Commissioner has filed a similar motion (Doc. 14).  For the following reasons, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **GRANT** the Commissioner's motion, and **DIRECT** the Clerk to enter judgment in favor of the Defendant.

### I.  BACKGROUND

    On February 15, 2018, Plaintiff protectively filed her applications for benefits, alleging that she became disabled on January 24, 2018.  After initial administrative denials of her claim, Plaintiff appeared at an administrative hearing held on August 7, 2019.  Both Plaintiff and a vocational expert, Larry A. Underwood, testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on September 17, 2019.  In that decision, the ALJ first concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023, and that she had not engaged in substantial gainful activity since the alleged onset date.  He then found that Plaintiff suffered from one severe impairment, systemic lupus erythematosus. He further determined that Plaintiff's impairments (both severe and non-severe), viewed singly or in combination, were not of the severity necessary to qualify for disability under the Listing of Impairments.

    Moving on to the next step of the inquiry, the ALJ found that Plaintiff had the residual functional capacity to perform light work except that she could only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, and that she could never climb ladders or similar devices and could not work in a hazardous environment.  She could do frequent but not constant

handling, fingering, and reaching.  Additionally, she could do not more than occasional reading, could not work in direct sunlight, could not do tasks requiring more than occasional public contact or more than occasional interactions with co-workers, could not work around more than four or five other people, and was limited to simple, routine, and repetitive tasks.

The ALJ next determined that with these restrictions Plaintiff could not do her past relevant work as a customer service clerk.  He found, however, that even with her limitations, Plaintiff could perform jobs like laboratory sample carrier and housekeeping cleaner.  The ALJ also determined that these jobs existed in significant numbers in the national economy.  The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act.

Plaintiff, in her motion for judgment, raises two issues.  She argues, first, that the ALJ failed properly to develop the record and obtain missing therapy records; and, second, that the ALJ mischaracterized the medical evidence when evaluating the medical opinions.

## II.  THE KEY EVIDENCE

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing.  It will then discuss the pertinent medical records.

### A.  Hearing Testimony

Plaintiff, who was 32 years old at the time of the hearing, testified, first, that she had graduated from high school and then obtained two associate degrees, one in general education and one in business administration.  She had worked at a Sam's Club at the customer service desk and lost her job when the store to which she was assigned closed.  However, she said that she was going to stop working anyway due to missing work on account of illness.

When asked about her living arrangements, Plaintiff said that she lived with relatives.  She was able to drive and also watched television but found it hard to read or even to hold a book or an e-reader.  She tired easily and was also nauseous and had pain in her hands, knees, and back, making it hard for her to stand or sit for prolonged periods of time.  It was painful to lift and grasp objects.  Plaintiff also had episodes of blurred vision which lasted twenty to thirty minutes.  In a typical day, Plaintiff needed to lie down or rest on multiple occasions.  She also suffered from panic attacks and was being treated for anxiety and depression.  She experienced bad days when she could not get out of bed, and better days when she could leave the house and go grocery shopping.  She would not have been able to work on the bad days and they occurred several times per week.

Plaintiff also indicated that she had problems with memory and concentration.  She could barely walk to the end of her driveway and could lift 15 pounds.  She could use a computer when her hands were not hurting.  Plaintiff did not assist with any household chores or do any outside work.

The vocational expert, Mr. Underwood, identified Plaintiff's past job as that of customer service clerk, a light, semi-skilled job.  He was then asked questions about a person of Plaintiff's age and educational and vocational profile who was limited to light work of a simple, routine, repetitive nature with numerous postural and environmental restrictions and who could have only occasional contact with others.  In response, he testified that such a person could not perform Plaintiff's past work but could be employed as a laboratory sample carrier or housekeeping cleaner.  If the person were limited to sedentary work, however, there would be no jobs available to him or her, and the same would be true if the person were off task more than 10% of the time or absent from work more than one day per month.  Additionally, being limited to only occasional handling or fingering and to performing tasks requiring visual acuity on an occasional basis would prevent the person from working as a laboratory sample carrier or housekeeper cleaner, and there would be no other light exertional jobs such a person could do if he or she had those restrictions as well as the other limitations described by the ALJ.

### B.  Summary of the Treatment Records

The medical records are extensive, and the Court's summary of them will focus on those portions highlighted in the parties' memoranda.  In her memorandum, Plaintiff notes that she had been treated by a rheumatologist for lupus as well as by a nephrologist who provided treatment for lupus nephritis with nephrotic syndrome.  She also was diagnosed with a malar rash and proteinuria and saw a therapist for depressive symptoms.  In other records, Plaintiff reported that she was stressed due to losing her job and suffering from lupus, and she described symptoms including depression, exertional dyspnea, and back pain as well as significant weight gain.  She was taking steroids to control her lupus and said that she experienced both knee and back pain when that medication was tapered off.  Her depression did improve when the medication prescribed for that condition was increased.  After providing this summary of the treatment records, Plaintiff's memorandum goes on to recount the opinion evidence, which is more fully detailed below.

The Commissioner's recitation of the evidence does not necessarily conflict with Plaintiff's. However, the Commissioner adds that Plaintiff did not see a psychiatrist for her depression; rather, that condition was addressed by Dr. Brenda Davis, Plaintiff's primary care physician.  Both Dr. Davis's notes, and other records where mental conditions were mentioned, documented mostly normal mental status findings.  The Commissioner also points out that the treatment notes from the rheumatologist, Dr. Palma, contain mostly normal physical findings and that Plaintiff generally denied experiencing symptoms such as fatigue, fever, or weight loss when seen by Dr. Palma and by the nephrologist, Dr. Moore, stating at various times that she was generally doing well or feeling well.

### C.  The Opinion Evidence

There are, first, opinions from treating sources.  Dr. Davis, the primary care physician, completed a form on August 9, 2019, noting that Plaintiff suffered from lupus nephritis,

depression, and anxiety.  Dr. Davis thought, among other things, that Plaintiff could stand for only fifteen minutes at a time and could only work four hours in a day; that she could do no lifting at all; that she frequently needed to elevate her legs; that she would need frequent breaks due to joint pain; and that she was markedly or extremely impaired in seven different areas of mental functioning involving work-related activities.  (Tr. 1257-58).

Melissa Sydor, Plaintiff's counselor and a licensed social worker, completed two mental residual functional capacity assessment forms.  On April 25, 2019, she reported that she had been seeing Plaintiff every other week since May 31, 2017, and that Plaintiff had been diagnosed with anxiety and depression and that her GAF was rated at 49.  The most significant limitations she noted were in the areas of understanding and remembering detailed instructions, maintaining attention and concentration, maintaining regular attendance, completing a workday without interruption from her symptoms, accepting criticism from supervisors, adapting to changes in the work setting, using public transportation, and tolerating normal levels of stress.  Ms. Sydor also believed that Plaintiff would be off task 20% of the time and miss up to six days of work per month.  Ms. Snyder commented that Plaintiff could not work due to lupus but that her anxiety was also a barrier to work.  (Tr. 1233-36).  She filled out a second form on August 8, 2019, indicating even more extreme limitations and indicating that Plaintiff was often unable to function and that she would isolate even when slightly anxious to the point where her family had to assist her with basic needs.  (Tr. 1242-47).

On March 20, 2018, Plaintiff attended two consultative evaluations.  Dr. Isihos, who performed an internal medicine examination, said that Plaintiff reported difficulty with walking, lifting, and fatigue since being diagnosed with lupus in 2016.  At the time of the evaluation, Plaintiff was able to do laundry once a week, to attend to her personal needs, and to go to the movies and socialize with friends.  The physical examination was essentially normal other than bilateral positive straight leg raising.  Dr. Isihos thought Plaintiff should avoid heavy lifting and carrying as well as prolonged standing, walking, and pushing and pulling with her arms.  Additionally, she should avoid heights, ladders, uneven surfaces, and overexposure to sunlight.  (Tr. 751-55).

The psychiatric evaluation was done by Dr. Ransom.  She noted that Plaintiff denied ongoing clinical-level depression, anxiety, and panic attacks.  Her affect was appropriate and her mood was neutral.  Plaintiff's attention and concentration were intact as was her memory.  Dr. Ransom noted that Plaintiff could cook, clean, do laundry, go shopping, and socialize with friends and family.  The only impairments Dr. Ransom identified were mild episodic difficulties in understanding and applying complex directions and instructions, regulating emotions, controlling behavior, and maintaining well-being, all due to mild and episodic panic attacks.  (Tr. 746-49).

A state agency reviewer, Dr. Gauthier, also expressed an opinion about Plaintiff's physical capabilities.  He concluded that she could meet the exertional requirements of light work but could not climb ladders, ropes, or scaffolds and could only occasionally bend at the waist.

(Tr. 510-14).

## III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  Failure to Develop the Record

Plaintiff's first claim of error relates to a gap in the treatment records. She points out that there were records from the social worker, Melissa Sydor, which were not before the ALJ, and that although she asked for assistance in getting these records, the ALJ never obtained them. This, in turn, Plaintiff argues, made it impossible for the ALJ accurately to assess the validity of the opinions rendered by Ms. Sydor because the ALJ was unable to determine if her opinions were supported by the treatment notes. She additionally contends that the ALJ should not have relied on the one-time evaluation by Dr. Ransom and the comments about Plaintiff's mental status found in the physical treatment records because those are not a proper substitute for treatment notes from a mental health counselor.

In response, the Commissioner argues that it was reasonable for the ALJ to have relied on Dr. Ransom's opinion and that the Social Security Administration made all necessary efforts to obtain Ms. Sydor's records. In support of that latter argument, the Commissioner points out that those records were requested twice during the initial administrative phases of adjudication, that Plaintiff's counsel had asked for them no fewer than four times, and that the ALJ both left the record open after the hearing for receipt of those records and offered to extend the time even further had counsel so requested. The Commissioner also cites to numerous portions of the applicable regulations indicating that it is not always necessary for an ALJ to have notes of mental health counseling in order to make a proper decision as to a claimants residual mental functional capacity.

In her memorandum, Plaintiff relies heavily on this Court's decision in *Hull v. Comm'r of Social Security*, 2019 WL 1760053 (W.D.N.Y. Apr. 22, 2019) as authority for the proposition that it is error for an ALJ to assess a claimant's mental residual functional capacity without the benefit of longitudinal treatment records. In *Hull*, this Court, after citing to well-established authority that an ALJ has an affirmative duty to develop the record even when the claimant is represented by counsel, turned to the question of whether the ALJ had erred by failing to obtain two years' worth of mental health treatment records which included notes of counseling sessions and periodic medication management reviews. The Commissioner had argued that the ALJ did not need these notes in order to make his decision because the treating psychiatrist had indicated, in his opinion, that the claimant was doing quite well and was in control. In rejecting that argument, this Court held that

> [t]he Commissioner's regulations recognize that when evaluating mental impairments, there is a "[n]eed for longitudinal evidence." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(5). This is because mental disabilities "are best diagnosed over time." *Olejniczak v. Colvin*, 180 F. Supp. 3d 224, 228 (W.D.N.Y. 2016); *see also Henley v. Berryhill*, No. 17-CV-445, 2018 WL 3866670, at *5 (W.D.N.Y. Aug. 15, 2018) (same). Thus, a two-year gap in Hull's mental health records is not harmless error.

*Hull*, 2019 WL at *4.

What is missing from the Court's decision in *Hull*, however, is any indication of what efforts were made either by the ALJ or by others within the adjudicative process to obtain the missing records. Plaintiff's memorandum similarly omits any reference to the multiple attempts to obtain the records and does not identify what additional actions she believes the ALJ should have taken in order to acquire them. Read broadly, Plaintiff's argument appears to be that it is always error to assess a claimant's mental residual functional capacity when longitudinal treatment records exist but are not made part of the record, regardless of how extensive the efforts have been to obtain them. That does not appear to be an accurate statement of the law. Rather, it is the Court's task to determine whether the ALJ failed in his duty reasonably to develop the record. *See* 20 C.F.R. § 404.1512(b)(1) (the Social Security Administration "will

make every *reasonable* effort to help you get medical evidence from your own medical sources...." (emphasis supplied)); *see also Devora v. Barnhart*, 205 F. Supp. 2d 164, 174 (S.D.N.Y. 2002) ("an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing").

Here, the record bears out the Commissioner's representations concerning the efforts to obtain Ms. Sydor's notes. First, the state agency requested those notes on two occasions, February 22, 2018 and March 8, 2018. (Tr. 519). She apparently did not respond to either request.

Second, at the beginning of the administrative hearing, counsel stated that "we're waiting on [Ms. Sydor's] treatment notes. We've requested them three times dating back to April .... It's my understanding that they were mailed ... to the incorrect address, and we're still trying to get those records." (Tr. 457-58). The ALJ responded that he was "happy to hold the record open for those and for a reasonable period of time." (Tr. 459). At the conclusion of the hearing, he ordered the record to be held open for sixteen days, or until August 23, 2019, and also said that he would consider a request to extend that date if counsel needed more time. (Tr. 501). Counsel did not ask the ALJ at that time for assistance in getting the records at issue.

Next, two days after the August 23 deadline, counsel asked for the first time that the ALJ assist in obtaining the missing notes, advising the ALJ in a letter dated August 25, 2019, that counsel had made four requests for the notes between April 13, 2019 and August 23, 2019 (the last date when the record was open) and that Ms. Sydor had failed to provide them. (Tr. 703). This was followed by a September 6, 2019 letter asking that the record be held open for an additional two weeks because counsel was still waiting for both Ms. Sydor's notes and records from Strong Memorial Hospital, which had been requested three times. (Tr. 704).

The ALJ's response to those requests is found in his decision. He noted that "the claimant has requested additional time and assistance in procuring evidence from Ms. Sydor" and, in denying that request, he explained that

> the undersigned notes that Ms. Sydor is a social worker and the record contains evidence related to the claimant's psychiatric health from the progress notes and examination records of at least four physicians and one examining source PhD psychologist during the period at issue. For these reason, any additional records from Ms. Sydor are not needed, and the undersigned is not persuaded by Ms. Sydor's opinions.

(Tr. 52).

Ideally, of course, it would have been helpful to have Ms. Sydor's notes as a part of the record. The facts show, however, that those notes had been requested on at least six separate

occasions; that the ALJ was aware of counsel's ongoing efforts to obtain them; that he granted a reasonable extension of time for counsel to complete that task; and that the first request for his assistance came after the record closed. Given this particular sequence of events, the Court cannot say that the ALJ failed to make a reasonable effort to develop the record as it relates to Ms. Sydor's notes, and a remand is not justified on that ground.

That conclusion does not completely moot Plaintiff's first claim of error, however. Regardless of whether the ALJ had an additional obligation to seek out Ms. Sydor's notes, Plaintiff argues that on the record as it stands, the ALJ did not have a reasonable basis for discounting her opinions, which, if credited, would have precluded Plaintiff from competitive work activity. The Court now turns to that question.

As noted above, the ALJ determined that he had enough evidence, in the form of notes from other providers and the opinion of Dr. Ransom, to determine Plaintiff's mental residual functional capacity. He observed that the mental status examination conducted by Dr. Ransom was essentially normal and that her only diagnosis was a mild panic disorder. (Tr. 50). Next, he pointed out the differences between what Plaintiff told Dr. Ransom and the more significant symptoms she reported to Dr. Davis two months later, and noted that although Plaintiff told Dr. Davis in November, 2018, that she was not getting better, she said the opposite to Dr. Moore, and reported improved symptoms to Dr. Davis in February, 2019. (Tr. 51). During this time frame, Dr. Davis was treating Plaintiff for her mental health conditions and had prescribed medication for her. The ALJ found Ms. Sydor's opinions to be in conflict with all of these reports and concluded that the treating records were "more consistent with mild limitations," adding that "[i]f the claimant had marked and extreme limitations in every area of mental functioning, then it is not unreasonable to expect more from the treating record than the claimant stating she was doing 'well' and exhibiting no mental status abnormalities." (Tr. 52).

An ALJ is entitled to consider the mental health treatment provided by a primary care physician in determining a claimant's mental residual functional capacity. *See, e.g., Henry v. Comm'r of Social Security*, 2018 WL 6039297 (W.D.N.Y. Nov. 19, 2018). Additionally, as this Court has observed, "it is well-settled that an ALJ may rely on the opinion of a consultative examiner in assessing the RFC." *Tammy C.-J. v. Comm'r of Soc. Sec.*, 523 F.Supp.3d 368, 376 (W.D.N.Y. 2021). Here, the ALJ took both Dr. Davis's treatment notes and course of treatment into account as well as Dr. Ransom's evaluation and the statements made by the Plaintiff to Dr. Davis, Dr. Moore, and Dr. Ransom. That is enough of a basis upon which to make a residual functional capacity determination, and the ALJ therefore did not err in making his decision even without the counseling notes from Ms. Sydor. Thus, the Court finds no merit in Plaintiff's first claim of error.

### B. Evaluation of Dr. Davis's Opinion

Plaintiff's second argument relates to the ALJ's evaluation of the treating source opinion from Dr. Davis. She asserts that the ALJ's factual findings which he used to undercut that

opinion are not supported by the record and that he mischaracterized or misinterpreted the medical records when discounting Dr. Davis's conclusions. The Commissioner responds that the ALJ reasonably relied on, and reasonably interpreted, the treatment notes from Dr. Palma and Dr. Moore, Dr. Davis's own notes, and the various expert opinions in concluding that Dr. Davis's very restrictive opinion was not entitled to be given significant weight.

The ALJ provided this rationale for giving little weight to Dr. Davis's pessimistic view of Plaintiff's physical capabilities. After summarizing the treatment notes from Drs. Davis, Palma, and Moore, the ALJ stated that "these records do not suggest widespread joint pain or chronic and unrelieved fatigue. There are a few brief periods of reportedly increased symptoms for which there are not significant corresponding objective musculoskeletal or constitutional abnormalities." (Tr. 48). He reasoned that if Plaintiff were as limited as she testified, the record would reflect more severe symptoms on examination or more requests for urgent treatment. Therefore, he found that Dr. Davis's opinion was "inconsistent with the treating and consultative record" including the notes of both of the specialists and with the findings made by Dr. Isihos, making it largely unpersuasive. Additionally, he noted that most of Dr. Davis's treatment was for Plaintiff's psychological issues and that most of the treatment of her lupus was by Drs. Palma and Moore, to whom she reported few severe symptoms and whose physical findings were largely unremarkable. (Tr. 49).

The particular facts which, according to Plaintiff, the ALJ got wrong when he reached this conclusion relate to the symptoms caused by her lupus. Plaintiff notes that, in her hearing testimony, she said that she was about to lose her job due to attendance issues stemming from her lupus before the store closed and she was laid off. She also argues that, contrary to the ALJ's findings, she did report pain, fatigue, and issues with her hands to the various examining physicians. She acknowledges that at some of her examinations, no severe symptoms were noted, but also points out that her lupus became more severe when she was weaned off the steroids used to treat it. She also faults the ALJ for concluding that Dr. Davis's opinion was contradicted by the one expressed by Dr. Isihos and that it was inconsistent with the treatment records.

It is accurate to say that an ALJ's decision concerning how much weight to give to a treating source opinion cannot be sustained if the ALJ has seriously mischaracterized the record. *See, e.g., Harris v. Colvin*, 149 F.Supp.3d 435, 442 (W.D.N.Y. 2016). The same is true if the ALJ reads the record selectively and focuses on just the evidence supportive of his decision while ignoring substantial evidence to the contrary. *See Lewis v. Colvin*, 2016 WL 624922, *2 (W.D.N.Y. Feb. 17, 2016). But that is not what happened here. The ALJ accurately summarized the treatment notes and they reflect that, most of the time, Plaintiff told her doctors that she was doing well and had few, if any, serious complaints. He was also entitled to, and did, assign less than full credibility to Plaintiff's testimony (Tr. 46), and Plaintiff has not challenged that finding. In short, the Court does not find that the ALJ mischaracterized the record in the ways that Plaintiff has argues, and concludes that he was justified in finding Dr. Davis's opinion to be less persuasive than that of Dr. Isihos - whose opinion is, in fact, inconsistent with the severe

restrictions put forth by Dr. Davis, despite Plaintiff's argument to the contrary.  Consequently, the Court finds no merit in this second claim of error, and it will therefore affirm the Commissioner's decision finding that Plaintiff did not meet the requirements for disability as set out in the Social Security Act.

## V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 13), **GRANTS** the Commissioner's motion (Doc. 14), and **DIRECTS** the Clerk to enter judgment in favor of the Defendant Commissioner of Social Security.

**/s/ Terence P. Kemp**
**United States Magistrate Judge**